**Sylvia ANDERSON, Plaintiff,**

v.

**GROUP HOSPITALIZATION, INC., Defendant.**

**Civ. A. No. 83–2016.**

United States District Court, District of Columbia.

Oct. 23, 1985.

---

James H. Heller, Irving Kator, Kator, Scott & Heller, Washington, D.C., for plaintiff.

Anne M. Magruder, Susan L. Shor, Whiteford, Hart, Carmody & Wilson, Washington, D.C., for defendant.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, District Judge:

This is a race-discrimination-in-employment proceeding. The plaintiff, Ms. Sylvia Anderson, a black and former employee of Group Hospitalization, Inc. ("GHI") sought damages and equitable relief under both 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e–1 *et seq.* Before trial plaintiff's counsel dismissed companion claims under 42 U.S.C. § 1985(3) and the District of Columbia Human Rights Act.

The § 1981 claim was tried to a jury. The jury returned a verdict of $100,000 damages for plaintiff. Judgment for plaintiff was entered on the verdict. GHI made a timely motion for judgment notwithstanding the verdict which the Court denied.

The Court's findings of fact and conclusions of law which follow, relate to the plaintiff's Title VII claims.

**1.** Record references are as follows: Testimony, by name of witness; Plaintiff's Exhibits, "PX

## FINDINGS OF FACT

1. Ms. Anderson began her employment with GHI in October 1972, directly after finishing high school and secretarial school. She began as a Grade 4 Clerk earning $5,784.00 a year.

2. During the next 5½ years because of the quality of her performance, plaintiff was promoted successively to MT/ST Operator (Grade 5), Secretary (Grade 6), Assistant to the Supervisor (Grade 7), Training Instructor (Grade 8) and Assistant Supervisor (Grade 10). She held the last title and grade from May 14, 1978 until her termination on July 31, 1981. In addition to these promotions she regularly received salary increases based on annual performance appraisals of "competent" or better. Her final salary on July 31, 1981 was $19,462 per year. (PX 2–6; Stip. 1 to 3.)[1]

3. In her initial position as Assistant Supervisor within the Marketing Services Department of GHI's Marketing Division plaintiff assisted in supervising a clerical and support staff for marketing and sales of health insurance to small groups. In the summer of 1979 the Manager of the Marketing Services Department, Kay Viverette, a white supervisor, asked plaintiff to transfer to the Small Groups Section of that Department headed by Reba Sue Dodd. Ms. Viverette told her that she would be "an asset" in her new job. Plaintiff agreed and the transfer was completed in October 1979. (PX 2; Stip. 7–9.)

4. Plaintiff worked as Assistant Supervisor to Reba Sue Dodd, a white, until May of 1980 when Ms. Dodd resigned. The two worked well together—consulting regularly and jointly sharing supervisory responsibilities. This was a time of stress for their section as well as for the entire Marketing Division because GHI had been steadily losing sales because of increased competition. Moreover, the Small Groups Section had been reorganized and given greatly increased sales responsibilities with more complicated coverage options to offer customers. This, in turn, caused a correspond-

_____"; Defendant's Exhibits, "DX _____; Paragraphs of the Stipulation of Facts, "Stip. _____."

ing increase in paperwork and overall work for the Small Groups Section. (Stip. 4–6.)

5. Plaintiff's annual performance appraisals at GHI were rendered on a November to November cycle. In 1978 she received a "superior" rating from her supervisor with the majority of her performance indicators either "superior" or "outstanding." In 1979, because of her mid-year transfer, Kay Viverette prepared plaintiff's performance appraisal and gave her a "competent + " with 50 percent of her performance indicators as "superior." The new Vice-President of the Marketing Division (white) had announced that, because of the need to improve sales performance, everyone in that Division would initially be rated "competent" until they proved otherwise.

6. When Reba Dodd left GHI in May 1979, she recommended that plaintiff be appointed as her successor. However, Kay Viverette informed plaintiff that she lacked sufficient experience for the position. The position was later filled by Susan Feist, a white from another Division of GHI. Susan Feist and Viverette had previously worked together in the past. Unlike plaintiff, Ms. Feist had no previous experience in marketing. (Stip. 11–13.)

7. In June 1979, just after Ms. Feist's appointment, Ms. Viverette gave plaintiff a 6–month interim performance review of "competent + " with 7 of 10 indicators "superior" or "competent +." Ms. Dodd testified for the plaintiff and stated that she would have given her an "outstanding" rating for the preceding six months.

8. When Feist arrived to supervise the Small Groups Section, she declined plaintiff's and Ms. Dodd's offers for a briefing on the current work and personnel, stating that she intended to make her own judgments and considered briefings a waste of time. Ms. Feist promptly reallocated the supervisory functions. She worked mainly with the sales and service representatives in the section and assigned the plaintiff to the responsibility for the increased and time-consuming paperwork. After a brief period she stopped taking plaintiff to staff meetings in Viverette's office or even to other outside meetings as the plaintiff had experienced before Feist became supervisor. Her stated reasons were that one of them should be in the section at all times. Feist also refused to meet separately with plaintiff to discuss performance appraisals of section employees even though the plaintiff was their immediate supervisor according to the staffing patterns.

9. Ms. Feist's supervisory style was very different than that of her predecessor, Ms. Dodd, or the style of the plaintiff. In her testimony and in the testimony of other witnesses, Ms. Anderson presented herself as a calm, poised, clear thinking person. Her performance appraisals also describe her in these terms. (PX 2–6.)

10. In contrast, Susan Feist was described by witnesses as loud and frequently profane. She described herself as "tough." On the witness stand her demeanor was overbearing and authoritarian.

11. There was undisputed testimony that Susan Feist openly made within the unit several remarks that were heard and construed as racial. They were resented by some black employees. There was also testimony that she gave more praise to white employees than to blacks, for similar performance.

12. On January 7, 1981, Susan Feist gave plaintiff her 1980 performance appraisal signed by Ms. Feist. The rating had been approved by Kay Viverette some two months earlier. She was given an overall rating of "competent" and noted as eligible for promotion. Ms. Feist did not recall why the appraisal was presented to plaintiff several months late but acknowledged that she had not indicated any deterioration in plaintiff's work during those months when she discussed the appraisal with plaintiff in early January. (PX 6.)

13. On March 6, 1981, Susan Feist and Kay Viverette called plaintiff to a meeting with them and Ms. Viverette's deputy. Plaintiff was given a new interim performance appraisal prepared by Ms. Feist and approved by Ms. Viverette. Plaintiff was

surprised, since she had not expected to receive an interim performance rating. Her overall interim performance rating was "marginal." A written commentary included a number of sharply worded criticisms of plaintiff's performance which were in marked contrast to the annual appraisal which Feist had given two months earlier. (PX 7.)

14. The March 1981 interim performance review contained the statement that plaintiff "may be suited for a different line of work." During the meeting, Ms. Viverette told plaintiff that if she transferred out of the Small Groups Section the "marginal" review would not be entered in her Personnel File. The file would then only include a positive 1980 performance review. A marginal review is a serious matter and the plaintiff having no prior warning or indication of this type of performance on her part, said she needed to think it over.

15. On Monday, March 9, 1981, plaintiff gave Kay Viverette a written memorandum soliciting her supervisors' support for no less than a lateral transfer, listing five other areas of GHI operations as her areas of interest. Ms. Viverette said she would check with the managers of those areas for plaintiff. Plaintiff, at the time, was a grade 10 employee and the five areas she listed involved grade 11 positions.

16. Plaintiff also interviewed with GHI's Personnel Manager, Janet La Marre, to seek her help in securing a transfer. Ms. La Marre, a white, knew of her interim "marginal" performance rating. She asked plaintiff if she would accept a demotion and indicated that it might be necessary for her to do so. Plaintiff replied that she was not seeking a demotion but would be willing to consider one, depending on the position and salary. Plaintiff is the divorced mother of a young boy who received little support from his father.

17. Before 1981 several white supervisors in the GHI Marketing Division had been demoted without loss of pay and transferred to other positions because of dissatisfaction with their performance. During 1981 four white employees, grade 13 and 14 service and marketing representatives in the Marketing Division, were also demoted and transferred without loss of pay because of supervisors' beliefs that they would perform better in other jobs. (PX 22; Stip. 59.) The plaintiff was interested in receiving similar treatment from GHI as they afforded the white employees.

18. Plaintiff heard nothing further from Janet La Marre about transfer possibilities. However, on July 10, 1981 Kay Viverette advised plaintiff that no positions were available in the areas mentioned in her March 9 memorandum.

19. Prior to March 6, 1981, Susan Feist had never communicated to the plaintiff any criticisms of her work performance. She received the negative criticism for the first time that day. Moreover, before Feist came to the Small Group Section, Kay Viverette had told her and Reba Dodd not to help the Section's telephone marketing representatives answer the telephones. Now, however, this was a major criticism by Susan Feist, as was the fact that plaintiff mostly stayed at her desk handling the section's paperwork which Ms. Feist had assigned to her. In the period following the March 6 meeting, plaintiff adjusted her behavior in response to these criticisms.

20. In late April 1981 having heard nothing about any transfer possibilities and not having received any feedback from Susan Feist on her performance since the March 6 meeting, plaintiff asked for a meeting to discuss the matter of her performance. Ms. Feist advised that her performance had improved, asked her to prepare a log of her daily activities for the next month, and assigned her some specific tasks. Plaintiff turned in the log and carried out the other assignments. She had no further communication about her performance until early July 1981.

21. In July 1981, Kay Viverette and Susan Feist asked for plaintiff's resignation from GHI. They, in turn, informed Janet La Marre who approved the action. (Stip. 38.)

22. On July 10, 1981, plaintiff met with Kay Viverette and Susan Feist. Ms. Viverette advised her that there were no transfer possibilities, that her performance had not improved, and that she had the choice of resigning effective July 31, 1981 or being terminated immediately for unsatisfactory performance. When the plaintiff responded "I guess I don't have much choice," Ms. Viverette replied, "That's right." Plaintiff signed the resignation form but did not put any reason on the line provided for that purpose. (Stip. 39–47; PX 10.)

23. At the time plaintiff was employed, GHI had a policy of formally counseling and giving written warning to employees with performance problems. Janet La Marre viewed the March 6, 1981 meeting as an informal counseling and warning session and said that no more was required in the case of employees at grade 9 and above, although she admitted it was desirable. Ms. La Marre had known plaintiff longer than either Ms. Viverette or Ms. Feist. She testified that she was surprised at the claimed sudden deterioration in plaintiff's performance but asked no questions about that when termination was discussed. (PX 9.)

24. Although Susan Feist claimed she had repeatedly discussed plaintiff's performance with her but the only such discussion she could recall was her testimony concerning the March 6, 1981 meeting. Her memory in many respects was generally selective and questionable. Plaintiff recalled only three such discussions with Ms. Feist in a full year: the January 7, 1981 meeting on her 1980 annual performance appraisal; the March 6, 1981 meeting; and the April 1981 meeting which she initiated. The plaintiff's testimony was not disputed.

25. At the time of her termination plaintiff was the only black among seven supervisors under Kay Viverette. She was one of only three blacks in supervisory or managerial positions out of 17 such persons in the entire Marketing Division. One of the three had just been hired from outside. There were no training, education, or other barriers to promotions within that Division, and GHI, with a 52% black work force in 1981, had a policy favoring promotion from within whenever possible. (PX 23, 24; Stips. 60, 62.)

26. On May 12, 1981, GHI was notified that its contract to process Medicare Part B claims would not be renewed after September 30, 1981. Some 149 GHI employees were affected by this action, 20 of whom resigned. Between May 12 and September 30, 1981, the other 129 Medicare B employees, both white and black were reassigned. GHI argued that the need to place these employees made it impossible to transfer plaintiff in view of her "marginal" interim performance review. However, that review was supposed to have no effect if plaintiff transferred out of the Small Group Section. The reassignment of the 129 GHI employees affected by the loss of the Medicare contract demonstrated that GHI could exercise flexibility and discretion in reassigning employees at a time when it professed that nothing could be done for the plaintiff. (DX 42–44.)

27. The evidence of racial remarks and different treatment of whites and blacks by Susan Feist, the under-representation of blacks in supervisory positions within the Marketing Division and within Kay Viverette's department, and the disparate treatment of plaintiff versus white employees of that Division with respect to transfers without loss of pay, the Court finds that race was the effective and controlling reason for plaintiff's termination by GHI and that she would not have been so terminated but for her race.

28. In returning a verdict for the plaintiff, it is clear that the jury found that plaintiff's performance had not deteriorated; that her termination in July 1981 was not justified; that she was treated differently than white employees similarly situated; and that the reasons GHI gave for terminating her and refusing to reassign her to another position were a pretext.

29. If the plaintiff had continued her employment at GHI after July 31, 1981, as Assistant Supervisor of the Small Groups Section of GHI's Marketing Division from

which she was discharged on that date and had not been subjected to discriminatory treatment by defendant, she would have received "competent" or better performance appraisals; and her position would have been upgraded from a Grade 10 to a Grade 11 in January 1982 and she would be earning an annual salary of $27,495 (PX 21, 24; Testimony of Janet La Marre).

30. The plaintiff would have also been entitled to other employment benefits in addition to higher pay if she had continued her employment with GHI from August 1, 1981 including, but not limited to, cost-free health insurance for herself and her son and cost-free group term life insurance.

### CONCLUSIONS OF LAW

1. The Court has jurisdiction of this matter.

2. The Court concludes that the plaintiff has sustained by a preponderance of the evidence that she was a victim of racial discrimination and that she was unlawfully terminated from her employment with Group Hospitalization, Inc. on July 31, 1981, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–1 et seq.

3. That the plaintiff is entitled to reinstatement to the position she held at the time of her unlawful termination or an equivalent position, together with all the entitlements and benefits she would have received during the period of her unlawful termination.

### JUDGMENT AND ORDER UNDER TITLE VII

In accordance with the Memorandum Opinion and the findings of fact and conclusions of law set out therein, filed on this date, the Court enters the following judgment and order on the claim of the plaintiff Sylvia Anderson, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–1 et seq. (Title VII); and it is

ADJUDGED and ORDERED as follows:

1. That the plaintiff Sylvia Anderson is awarded judgment against the defendant Group Hospitalization, Inc., because of the defendant's wrongful termination of her employment on July 31, 1981. The termination of the plaintiff's employment was based on her race, in violation of Title VII of the Civil Rights Act of 1964.

2. That the defendant shall reinstate plaintiff, retroactive to August 1, 1981, to the position of Assistant Supervisor, or its equivalent, at a current grade and annual salary of Grade 11 earning $27,495 per year. The defendant shall also provide and pay to the plaintiff all wage, retirement and other employment emoluments that would have accrued to her benefit as a as Grade 10 Assistant Supervisor until January 1982 and as a Grade 11 Assistant Supervisor since that date.

3. That the defendant is hereby enjoined from discriminating against plaintiff in the terms and conditions of her employment because of her race or because of her past opposition to such discrimination, including the filing of this suit.

4. Plaintiff is entitled to cover the costs of this action, including reasonable attorneys' fees. She shall file her request for any non-taxable costs and attorneys' fees within 15 days after the time for appeal from this Court's final judgment expires or within 15 days after any mandate of the Court of Appeals affirming that judgment, whichever is later.